UNITED STATES DISTRICT COURT
SOUTHERN DIVISION OF ILLINOIS
EAST ST. LOUIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| v. ) | Cause No. 3:15-cv-90 NJR PMF |
| ) | |
| $220,020.00 IN UNITED STATES ) | |
| CURRENCY, ) | |
| ) | |
| Defendant. ) | |

**MOTION FOR SUMMARY JUDGMENT AND INCORPORATED**
**MEMORANDUM OF LAW IN SUPPORT**

COMES NOW Claimant, James Kirkham, by and through counsel, and files the following Motion for Summary Judgment and incorporated Memorandum of Law in Support. In support of this Motion, Claimant states as follows:

I.  **Statement of Uncontroverted Material Facts**

   A.  **The Currency Seized in this Case Consists of Mr. Kirkham's Savings and Business Proceeds**

1.  Mr. Kirkham is self-employed in the business of buying and selling baseball cards, gold, silver, and diamonds. Exhibit 1, Claimant James Kirkham Dep. ("Cl. Dep.") 17:12-13; 52:20-22; 58:3-59:11, June 23,2015.

2.  Because of the nature of the business, Mr. Kirkham does not maintain uniform business records. *Id.* at 47:4-8; 49:10-11.

3.  Many of his business transactions are made in cash, and thus it is extremely difficult to obtain records of those transactions, if any exist at all. *Id.* at 45:23-46:1; 47:4-7; 49:6-11; 80:4-5, 17-19; 93:17-21.

1

4. However, pursuant to efforts in this case, Mr. Kirkham was able to recover some cancelled checks and letters from a few regular customers to verify the receipt of money representing the majority of the defendant assets, evidencing $149,357.12 in sales between 2010 and 2014.  *Id.* at 92:1-93:21.

5. This comprises a small component of his gross sales over the same period of time, because the vast majority of his sales are smaller cash sales. *Id.* at 79:19-80:5, 80:17-19, 93:9-21, 106:4-107:2.

6. That Mr. Kirkham is regularly employed in the business of selling precious metals, diamonds, baseball cards and other memorabilia is amply supported by the testimony of other witnesses who regularly did business with him.  Exhibit 2, McCall Dep. 9:2-21; Exhibit 3, Soel Dep. 7:14-8:4, 10:11-12; Exhibit 4, Peal Dep. 8:8-22, 8:23-9:10; Exhibit 5, Scantland Dep. 12:2-23.

7. Witness Brian McCall estimated purchasing $75,000-$100,000 in precious metals and diamonds from Mr. Kirkham over time and noted that many of the smaller transactions were conducted in cash.  Ex. 2, McCall Dep. 16:10-17.

8. It was McCall's understanding that, when he would pay by check, Mr. Kirkham "went down to the bank and cashed [checks] on the spot."  Ex. 2, McCall Dep. 13:2-5.

9. Witnesses Robert Soel and Jim Peal testified to repeated contacts, numbering in the hundreds of occasions each, interacting with Mr. Kirkham in flea markets or sports "card shows" in which Mr. Kirkham had many other customers.  Ex. 3, Soel Dep. 7:14-8:4, 10:11-12, 11:5-25; Ex. 4, Peal Dep. 8:8-22, 8:23-9:10.

10. These witnesses substantiated that the business of buying and selling sports cards is often conducted in cash and that receipts and other detailed records are not the norm in that

business.  Ex. 3, Soel Dep. 7:14-8:4, 10:11-12, 11:5-25; Ex. 4, Peal Dep. 8:8-22, 8:23-9:10, 11:9-12:4.

11. Mr. Peal reported seeing Mr. Kirkham with several thousand dollars in cash at card shows, estimating the amount was five thousand dollars ($5,000.00) or a little more.  Ex. 4, Peal Dep. 11:19 to 12:4.

12. Mr. Kirkham's business includes buying trips to Arizona and California, in part because there are certain items he can get there, such as limited-edition "Jordans" (highly sought-after Nike basketball shoes named after Michael Jordan), which he cannot obtain in the Indianapolis area.  Ex. 1, Cl. Dep. 38:6-24; 96:2-21; 97:22-25.

13. Mr. Kirkham regularly brings large amounts of cash with him on these trips where he purchases cards, shoes, and other collectibles as inventory for sale in his business.  *Id.* at 36:3-10; 97:22-98:20.

14. Even though Mr. Kirkham has a Chase bank account, he does not trust banks and preferred not to keep large amounts of money in his account.  *Id.* at 36:22-24; 37:7-11.

      **B.**    **The Trip to California**

15. The Kirkhams were traveling to Sacramento, California to visit Bob and Donna Anderson, Mr. Kirkham's aunt and uncle and Mrs. Kirkham's sister-in-law and brother-in-law.  Ex. 1, Cl. Dep. 31:8-19.

16. Mr. Kirkham's uncle Bob was dying of cancer. *Id*. at 32:18-33:4; Ex. 6, Darlene Kirkham Dep. ("D. Kirkham Dep.") 12:19-13:1, Sept. 22, 2015.

17. Mrs. Kirkham wanted to visit Donna and Bob, but her husband was not able to travel because of his diabetes, so she asked her son, Mr. Kirkham, to accompany her on the trip.  Ex. 1, Cl. Dep.  33:5-8, 15-25; Ex. 6, D. Kirkham Dep. 10:22-13:24.

18. He had not been to Sacramento since he was a child and had not seen Bob in years, so he decided to go. Ex. 1, Cl. Dep. 31:14-17; 32:10-17; 33:5-8.

19. Though they did not have precise directions to Bob and Donna's house, they intended to call Donna's daughter when they got to Sacramento and then a family member would meet them. Thebeau Decl. ¶ 5, Jan. 28, 2015, ECF Nos. 2-1, 2-2.

20. Mr. Kirkham took the currency at issue in this action with him to California because he saw the trip as an opportunity to make purchases for his business while there. Ex. 1, Cl. Dep. 36:3-10; *see also supra*, ¶¶ 13-14 (establishing that he takes cash with him on other trips for the same purpose).

21. Mr. Kirkham hid his cash in a spare tire because he did not want to leave it in plain sight, or in a piece of luggage in plain sight of others. Ex. 1, Cl. Dep. 36:3-5 ("I'm not just going to throw it in the backseat.").

22. In addition to the risk of theft, Mr. Kirkham took measures to conceal his cash after learning on the Internet about law enforcement's practice of seizing cash from people driving on interstate highways on the pretext that large sums of cash constitute proceeds of illegal activity. *Id.* at 35:25-36:2.

### C. The Seizure of Mr. Kirkham's Savings

23. On September 9, 2014, Mr. Kirkham's mother, Darlene Kirkham, was driving a black 2009 Chevy Silverado pickup westbound on Interstate 70 with Mr. Kirkham riding in the passenger seat. Thebeau Decl. ¶¶ 1-2.

24. DEA Deputized Task Force Officer Stacey McElroy ("TFO McElroy") pulled the Kirkhams over at approximately the 29 mile marker, allegedly for following too close to the car ahead of them. *Id.* at ¶ 1; Ex. 6, D. Kirkham Dep. 16:24-17:8.

25. TFO McElroy noticed air fresheners and several pieces of luggage in the cab of the vehicle. Thebeau Decl. ¶ 1.

26. Mrs. Kirkham informed TFO McElroy that the truck was her husband's, that she and her son, Mr. Kirkham, were from Indianapolis, and that they were going to California to visit her sister-in-law. *Id.* at ¶¶ 1-2.

27. TFO McElroy informed Mrs. Kirkham that he intended to issue her a warning and asked her to sit in front of the police cruiser. Ex. 6, D. Kirkham Dep. 17:13-20.

28. Over the next several minutes, TFO McElroy proceeded to question Mrs. Kirkham and Mr. Kirkham separately about their travel plans, ultimately expanding what was a routine traffic stop into an extended factual investigation. *See* Claimant's Mot. to Suppress 2-6, Nov. 12, 2015 (Doc. 29); Ex. 6, Darlene Kirkham Dep. 16:36-17:11, 20:12-22:11, 23:21-24:4; Thebeau Decl. ¶¶ 3-8.

29. After interrogating Mrs. Kirkham and Mr. Kirkham repetitively about their trip and personal family matters, TFO McElroy asked Mrs. Kirkham, with a complete lack of factual justification, if there was anything illegal in the vehicle, and then if there were any drugs or large amounts of cash in the vehicle. Ex. 6, Darlene Kirkham Dep. 17:13-18:6, 20:12-22:11, 23:21-24:4; Thebeau Decl. ¶ 9.

30. Mrs. Kirkham responded by stating that "everything is fine in the truck" and shaking her head "no." *Id*. ¶ 9.

31. Mrs. Kirkham allegedly consented to TFO McElroy's request to search the vehicle. *Id.* at ¶ 10.

32. TFO McElroy and additional officers Christopher Singleton and Victor White, who had responded to the location, assisted with the search. *Id.* at ¶ 14.

33. During the search they opened the tailgate of the truck and discovered an aftermarket plywood box the size of the truck bed, sealed on the inside with a seam sealer-type substance. *Id.*

34. Mr. Kirkham advised officers the box was built by his father for the purpose of transporting DVDs, which he sells, while protecting the DVDs from getting wet. *Id.*; Ex. 1, Cl. Dep. 13:17-18; Ex. 6, D. Kirkham Dep. 31:8-32:5.

35. Officers also discovered a spare tire. TFO Singleton used a "density buster" to measure the spare tire's density and reported an abnormal reading. Thebeau Decl. ¶¶ 15-16.

36. While TFO McElroy was inspecting the tire, Mr. Kirkham told officers he had money inside the tire and estimated that there was $210,000.00 in United States currency in the tire. *Id.* at ¶ 17.

37. Mr. Kirkham brought the money on the trip so that he could make purchases while in California. Ex. 1, Cl. Dep. 36:3-10; Thebeau Decl. ¶ 24; *see also* Sec. I. B., *infra*.

38. After Mr. Kirkham told officers of the money in the tire, TFO McElroy handcuffed him and officers put him in the back of the police cruiser. Thebeau Decl. ¶ 17.

39. Mrs. Kirkham advised officers that the money must be Mr. Kirkham's "gold and silver money" and he probably intended to "buy some stuff over there." *Id.*

40. TFO Singleton then used K9 Paco to conduct a K9 sniff on the vehicle. *Id.* at ¶ 20; Ex. 7, Singleton Dep. 21:23-23:15, 23:25-24:6, Oct. 6, 2015.

41. Paco's behavior allegedly first changed near the rear quarter panel of the truck, on the passenger side. Ex. 7, Singleton Dep. 23:5-15.

42. Then Paco allegedly began nose-poking and scratching on the rear tailgate area of the truck. *Id.* at 24:2-6.

43. TFO Singleton interpreted this as Paco's "alert" and informed TFO McElroy that the dog alerted on the vehicle. *Id.*

44. Officers later transported the truck to a mechanic's garage to have the spare tire removed, and in the tire they allegedly discovered the currency at issue in this case. Thebeau Decl. ¶ 21.

45. Officers allegedly put the currency in a cardboard box, and put that box in a line with three other empty cardboard boxes of similar size and shape. *Id.* at ¶ 22.

46. TFO Singleton then conducted a K9 sniff of the boxes, during which Paco allegedly "alerted" on the only box that was not empty—the one which contained the currency. *Id.*

47. Officers conducted an additional search of the vehicle during which they seized cellular phones and a number of other items from the vehicle. *Id.* at ¶ 23.

## II. Pending Motions

### A. Claimant's *Daubert* Challenge to Paco's "Alerts"

Claimant Mr. Kirkham expects the Government to offer evidence of Paco's purported alert at trial in this matter to attempt to link the currency seized to drug trafficking activity. Claimant has filed a *Daubert* motion seeking the exclusion of improper expert testimony by Paco's handler, TFO Singleton that would seek to draw a conclusion from Paco's alert. Cl.'s *Daubert* Mot. to Exclude the Testimony of TFO Christopher Singleton, Nov. 23, 2015, ECF No. 31. That motion submits that, because TFO Singleton is not qualified to identify what substance Paco allegedly alerted to, because of the widespread contamination of U.S. Currency with cocaine, and because TFO Singleton was not Paco's first trainer and cannot establish that Paco would not alert to any U.S. Currency, whether or not contaminated, evidence of Paco's alert is

meaningless, unduly prejudicial, and inadmissible at trial. If Claimant's *Daubert* motion is sustained and such evidence is thus ruled inadmissible, Paco's alert is an improper source of evidence to evaluate the uncontroverted facts that might support the Government's ability to meet its burden of proof.

      **B.**    **Motion to Suppress**

On November 12, 2015, Mr. Kirkham filed a Motion to Suppress any and all evidence seized, test results concerning items seized, or testimony or statements made about the foregoing, during the unlawful search and seizure conducted by TFO McElroy and other police officers. In that Motion to Suppress, Mr. Kirkham argues that all evidence related to TFO McElroy's seizure of his assets must be excluded, including the alleged seizure of U.S. currency, observations of Mrs. Kirkham and Mr. Kirkham, and any other evidence that was the direct result of TFO McElroy's illegal stop. Cl.'s Mot. to Suppress, Nov. 23, 2015, ECF No. 29, at 16-17. The motion is currently pending before this Court. If the evidence sought to be suppressed in that motion is suppressed, the overwhelming majority of the information the Government seeks to use in this case will be unavailable to the Government in this matter.

**III.**    **Argument**

      **A.**    **Standard for Summary Judgment**

Summary judgment is proper when the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* FRCP Rule 56(c); *U.S. v. All Assets and Equipment of West Side Bldg. Corp.*, 58 F.3d 1181, 1186 (7th Cir. 1995). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

genuine issue for trial." *Catlin v. City of Wheaton*, 574 F.3d 361, 365 (7th Cir.2009) (citation omitted).

Summary judgment is available to a claimant in an asset forfeiture case when the Government's evidence, taken as a whole, is insufficient to meet the Government's burden to establish that the seized property is subject to forfeiture. See *United States v. One Hundred Thirty–Four Thousand Seven Hundred and Fifty Two Dollars United States Currency, More or Less*, 706 F.Supp. 1075 (S.D.N.Y.1987) (emphasis added) (granting claimant's motion for summary judgment in pre-CAFRA case under prior probable cause forfeiture standard, noting that "although the government has presented evidence sufficient to support a reasonable belief that there exists a connection between the $134,752 and some illegal activity, it has not provided evidence that gives rise to more than a suspicion of a connection between the money and a transaction involving a controlled substance"); *United States v. $191, 910 in U.S. Currency*, 788 F.Supp. 1090 (N.D.Cal.1992) (granted summary judgment in pre-CAFRA case where government failed to demonstrate probable cause to believe that currency seized was connected to drug transactions); *United States v. $12,840.00*, 510 F.Supp.2d 167 (D.Mass.2007) (granting the claimant's renewed motion for summary judgment where Government failed to meet its burden to connect $12,840 in United States currency found in backpack in trunk of car during traffic stop to illegal drug transaction); *United States v. $ 58,920.00 in United States Currency*, 385 F. Supp. 2d 144 (D.P.R. 2005) (granting claimants' motions for summary judgment where Government failed to establish a substantial connection between cash seized and exchange of a controlled substance).

### B. The Government Has Failed to Establish a Prima Facie Case of Asset Forfeiture Because No Admissible Evidence Demonstrates a Connection Between The Assets Seized And Controlled Substance Offenses

"[F]orfeitures are not favored and they should be enforced only when within both the letter and spirit of the law." *U.S. v. One Hundred Thirty-Nine Gambling Devices Alias Slot Machines, More or Less*, 109 F.Supp. 23 (E.D. Ill. 1952) (quoting *United States v. One Ford Coach*, 307 U.S. 219, 226, 59 S.Ct. 861, 83 L.Ed. 1249 (1939)). *United States v. $48,100.00 in U.S. Currency*, 756 F.3d 650, 653 (8th Cir.2014) (same).

The Civil Action Forfeiture Act of 2000 ("CAFRA") "significantly altered the burden of proof applicable to civil forfeiture actions—prior to CAFRA, courts applied a shifting burden based on the government's establishing probable cause for forfeiture—under CAFRA, "it is the Government's burden to show, by a preponderance of the evidence (and not probable cause), that forfeiture applies." *United States v. $22,173.00 in U.S. Currency*, 716 F. Supp. 2d 245, 249-50 (S.D.N.Y. 2010).

Under CAFRA, "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(3). In this case, the Government has pled, and must prove to prevail in this matter, that "[t]he defendant property constitutes property furnished or intended to be furnished by a person in exchange for a controlled substance, or proceeds traceable to such an exchange, or property used to facilitate a violation of 21 U.S.C. §801 et seq. and is subject to forfeiture pursuant to 21 U.S.C. §881(a)(6)." (Complaint at ¶¶1, 7). Each of these three theories of recovery proceeds on the theory that the Defendant proceeds are connected to ***drug trafficking or related federal controlled substance offenses***. Further, "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved

10

in the commission of a criminal offense" (the Government's theory here), the Government shall establish additionally that "there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3).

To prevail in a forfeiture action, the Government must establish by a preponderance of the evidence that the seized property is substantially connected to drug trafficking. 18 U.S.C. § 983(c)(1) & (3). The Government cannot meet this burden by merely inferentially establishing a likelihood that the seized property is connected to illegal activity generally—"the legally relevant question is not whether [claimant] may have participated in illegal activity, but whether there is evidence linking the arrest to an exchange involving a *controlled substance*." *United States v. $191,910 in U.S. Currency*, 788 F. Supp. 1090, 1095 (N.D. Cal. 1992) (emphasis added). *See also U.S. v. $60, 020.00 U.S. Currency*, 41 F.Supp.3d 277 (W.D.N.Y. 2011) ("The foregoing circumstances suggest that Luke was involved in some illegal activity. However, there must also be a nexus specifically linking the incriminating circumstances to illegal drugs for the government to prevail"); *United States v. $38,600 in U.S. Currency*, 784 F.2d 694 (5th Cir.1986) (evidence of large sum of money, drug paraphernalia and evasiveness concerning destination and the money's owner "may very well give rise to a reasonable belief that there exists a connection between the money seized and some illegal activity" but "here… gives rise only to a suspicion of a connection between the money seized and its use in a transaction for a controlled substance").

"While the government does not necessarily have to show a connection between the seized property and a specific drug transaction, if the government's theory about past or planned drug-related use of the money is based on mere speculation or suspicion, the seized money is not subject to forfeiture." *$48,100.00*, 756 F.3d at 655 (internal citations omitted). *See also United States v. $191, 910 in U.S. Currency*, 788 F.Supp. 1090 (N.D.Cal.1992) (granting summary

11

judgment for claimant where "there were no facts whatsoever connecting the seized currency with any illegal activity, let alone with narcotics activity"—while "the large amount of money carried, and Morgan's lies about the contents of his bags, do support a suspicion that he was at some point involved in some illegal activity, that is all that they support—a mere suspicion"); *United States v. $38,600 in U.S. Currency*, 784 F.2d 694 (5th Cir.1986) (granting summary judgment for claimant where "the evidence gives rise only to a suspicion of a connection between the money seized and its use in a transaction for a controlled substance"); *United States v. One Hundred Thirty–Four Thousand Seven Hundred and Fifty Two Dollars United States Currency, More or Less ($134,752)*, 706 F. Supp. 1075 (S.D.N.Y.1987) (emphasis added) (granting claimant's motion for summary judgment in pre-CAFRA case, noting that "although the government has presented evidence sufficient to support a reasonable belief that there exists a connection between the $134,752 and some illegal activity, it has not provided evidence that gives rise to more than a suspicion of a connection between the money and a transaction involving a controlled substance").

In *$134,752*, 706 F. Supp. at 1077-79, the government's uncontroverted facts established that claimant had been observed with a large sum of money in a vehicle, that vials containing cocaine residue were also in the vehicle, that approximately $134,000 in $100 bills was found on claimant's person, that weapons were found in the car, that claimant and the other occupants of the car had prior criminal records, and that claimant made numerous inconsistent statements about the origin of the money. In granting summary judgment on the claimant's behalf, the court stated that "the evidence presented ... may well support a reasonable belief that [claimant] had in the past, and perhaps at the time of the seizure, participated in illegal activity of some type," *id.* at 1083, but concluded that "the legally relevant question is not whether [claimant] may have

participated in illegal activity, but whether there is evidence linking the arrest to an exchange involving a controlled substance; ... [and] there is no evidence that the money was intended to be furnished to purchase a quantity of drugs ... in the future; that it was the proceeds of a previous sale; or that it in any way facilitated a violation of the drug laws." *Id*. *See also United States v. $38,600 in U.S. Currency*, 784 F.2d 694 (5th Cir.1986) (noting that "the discovery of a pipe bearing marijuana residue and rolling papers, while relevant, is certainly not . . . compelling," and finding that the paraphernalia, combined with the claimant's "evasiveness concerning his destination and the money's owner," was insufficient to support forfeiture of $38,000 discovered in the claimant's car, even under the lower, pre-CAFRA, probable cause standard).

Where the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government must establish that there was a substantial connection between the property and the offense. District courts "consider[] the totality of the evidence and circumstances, applying common sense considerations, when deciding whether the government has proved a connection between the seized property and illegal drug activity." *$48,100.00*, 756 F.3d at 653 (government failed to prove it more likely than not that claimant intended to use the currency in a planned drug transaction). *See also United States v. $22,173.00 in U.S. Currency*, 716 F. Supp. 2d 245, 250 (S.D.N.Y. 2010) (under post CAFRA authority, government must prove, by a "totality of the circumstances, that the property is substantially connected to narcotics trafficking").

Courts have refused to find that the Government has met its burden where a Claimant adduces evidence establishing the legitimate source of funds and the Government fails to meaningfully rebut that evidence. *U.S. v. $1,074,900.00 in U.S. Currency*, 932 F.Supp.2d 1053

13

(D. Neb. 2013) (Government failed to show substantial connection between drugs and more than $1 million in cash seized in traffic stop; a drug dog's alert was not sufficient, standing alone, to link the cash to drug transactions, the claimant confirmed the driver's statement to police about the legitimate source of the funds, and government did not rebut claimant's evidence concerning ownership of funds); *United States v. $12,840.00*, 510 F.Supp.2d 167 (D. Mass. 2007) (granting summary judgment to claimant where, although drug-sniffing dog alerted to $12,480 found in a backpack in the trunk of the car during a traffic stop, no other indicia of drug trafficking was found, and the driver consistently told police the money was from a tax return, even though he gave police inconsistent statements about his intended use for the money); *U.S. v. Currency $11,331*, 482 F. Supp. 2d 873 (E.D. Mich. 2007) ($10,000 seized from claimant's daughter during traffic stop was not traceable to drug trafficking in light of undisputed testimony that claimant loaned his daughter the money the day before it was seized, bank records showed claimant withdrew large amount of money a couple of days before seizure, and there was no reason to believe claimant was involved in drugs).

In *$48,100.00*, 756 F.3d 650, the claimant was pulled over for a traffic violation while driving his parents' RV from Colorado, where he had been visiting friends, back to his parents' home in Wisconsin. *Id.* at 652. During the stop, the claimant admitted to having a small amount of marijuana for personal use, so the officer conducted a probable cause search of the RV, finding almost 20 grams of marijuana, a pipe and other paraphernalia, and a backpack containing containing $48,100 in cash in a plastic bag. *Id.* The officer seized these items and the claimant's cell phone, and arrested claimant for possession of marijuana. *Id.* At the forfeiture hearing, the government conceded that the funds came from legitimate sources, but contended the claimant intended to use the money to purchase narcotics. *Id.* at 653. The magistrate found for the

government, *id.*, but on appeal the Eighth Circuit reversed. The court noted that much of the evidence could support both the government's and the claimant's positions:

> In light of the credible testimony indicating Nelson disdained banks, Nelson merely travelling with a large sum in currency does not by itself weigh more in favor of Nelson intending to use the currency to facilitate drug-trafficking. Nor do the methods of bundling and concealment weigh more heavily in favor of Nelson intending to use the currency to facilitate drug-trafficking. If one were to travel with a large sum in currency, common sense would support having a method of keeping it organized while carrying and concealing it from would-be thieves.

*Id.* at 654. Noting that the search of claimant's cell phone did not uncover any evidence of drug trafficking, the court found that the small amount of marijuana and paraphernalia in the RV were far more consistent with personal use than drug trafficking, and there was no affirmative evidence of any alleged planned drug transaction, so the government failed to carry its burden of proving by a preponderance of evidence that the money was substantially connected to drug trafficking. *Id.* at 655.

Here, the Government has failed to prove any connection between the money seized and the use of the money to sell or purchase controlled substances or engage any other illegal activity. Mr. Kirkham has come forward with evidence that he received his money through his sale of collectibles, sports cards, gold, silver and diamonds and the Government has not come forward with evidence to rebut this evidence, but insists on blindly disregarding Mr. Kirkham's credible testimony, supported by the testimony of other witnesses, that the majority of his sales were cash transactions and that detailed recordkeeping is not the norm in such transactions. To support its position, the Government relies on circumstantial evidence gathered primarily through an illegal search. *See* Government's Mot. for Summ. J., Nov. 12, 2015, ECF No. 28. Specifically, the Government points to a purported dog alert, the Kirkhams' explanation of their travel plans, Mr. Kirkham's statements about how much money he possessed, and the

concealment of the money as its substantial evidence. *See id.* at pp. 14-18. Such evidence cannot be considered because of the illegal methods with which it was obtained. *See* Cl.'s Mot. to Suppress 16-17.

Even if evidence from the traffic stop is considered, the Government has come forward with no substantial evidence to link Mr. Kirkham to any narcotics trafficking, and no evidence to indicate a substantial connection between the funds seized and any narcotics trafficking. The uncontroverted evidence indicates the opposite—that the funds seized were the proceeds of Mr. Kirkham's established business buying and selling precious metals, sports memorabilia, sports cards and other collectibles.

In light of the thinness or nonexistence of the Government's evidence linking Mr. Kirkham to controlled substance offenses, the Government would make much of the alerts of a canine after the currency had *already* been located. While the Seventh Circuit Court of Appeals has previously relied upon the currency contamination theory to hold "that the probative value of dog sniffs is, at most, minimal," it has more recently held "that dog alerts to currency should be entitled to probative weight." *$30,670*, 403 F.3d at 460. A neighboring Circuit has "recognized the potential limitations of a drug dog's alert by characterizing it as 'some—albeit slight—indication' of *drug activity*," while "still recogniz[ing] that an alert carries weight in considering *whether a substantial connection exists*." United States v. $63,530.00 in U.S. Currency, 781 F.3d 949, 956 (8th Cir.2015) (emphasis added); *see also United States v. $84,615 in U.S. Currency*, 379 F.3d 496, 501 (8th Cir.2004) ("the dog's alert to Bronstein's currency provides some-albeit slight-indication that Bronstein's money was connected to drug trafficking").

Such evidence, whatever its probative value, should not meet the Government's burden where the Government has failed to provide any other substantial evidence of a connection with

16

controlled substance trafficking offenses. Courts in a number of cases have held that the government had failed to meet its burden to establish that property was subject to forfeiture where there was an alleged drug dog alert. *See, e.g.*, *U.S. v. $1,074,900.00 in U.S. Currency*, 932 F.Supp.2d 1053 (D. Neb. 2013) (drug dog's alert was not sufficient, standing alone, to link over $1 million in cash, found during a traffic stop, to drug trafficking); *United States v. $12,840.00*, 510 F.Supp.2d 167 (D. Mass. 2007) (granting summary judgment to claimant where, although drug-sniffing dog alerted to $12,480 found in a backpack in the trunk of the car during a traffic stop, no other indicia of drug trafficking was found); *United States v. $ 58,920.00 in United States Currency*, 385 F. Supp. 2d 144, 153 (D.P.R. 2005) (stating that the police dog's "alert to the currency may also be worth noting, although perhaps worth little else" and finding the government failed to establish even probable cause where the only other evidence included claimants' "nervousness," the fact that they bought one-way tickets in cash, and had concealed the defendant currency in the pantleg of jeans inside their suitcases); *United States v. $17,700.00 in U.S. Currency,* CV 08-4518-ABC-JCX, 2008 WL 4838491, at *5 (C.D. Cal. Nov. 6, 2008) (internal quotation omitted) ("a positive dog alert must be combined with other credible evidence clearly connecting the money to drugs" to establish that currency is forfeitable).

The uncontroverted material facts of this case indicate that the Government cannot meet its burden in seeking forfeiture of assets under 21 U.S.C. § 881(a)(6), and summary judgment in Claimant James Kirkham's favor is appropriate.

**IV. CONCLUSION**

For the reasons detailed above, Claimant James Kirkham respectfully requests that this Court grant his Motion for Summary Judgment, and for such other relief as this Court deems necessary and proper.

Dated: November 23, 2015	Respectfully submitted,

By:	/s/ Adam D. Fein
Attorney for Claimant, James Kirkham
Adam D. Fein
120 South Central Avenue, Suite 130
Clayton, Missouri 63105
(314) 862-4332/ (314) 862-8050
afein@rsrglaw.com

**CERTIFICATE OF SERVICE**

By signature above, I further certify that on November 23, 2015, the foregoing was served by operation of the Court's electronic filing system on Ms. Jennifer D.L. Hudson, Assistant United States Attorney.