IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) CIVIL NO.   15cv90-NJR-PMF |
| | ) JUDGE: Judge Rosenstengel |
| vs. | ) |
| | ) |
| $220,020.00 in UNITED STATES CURRENCY, | ) |
| | ) |
| Defendant. | ) |

**RESPONSE IN OPPOSITION TO CLAIMANT'S DAUBERT MOTION AND MOTION TO STRIKE PURSUANT TO FED.R.CIV.P. 37.**

PLAINTIFF, United States of America, by Stephen Wigginton, United States Attorney for the Southern District of Illinois and Jennifer Hudson, Assistant United States Attorney, makes the following Response in Opposition to Claimant's Motion for Daubert Motion and to Strike Chief Singleton's testimony.   In support thereof, the government states as follows:

**CLAIMANT'S ASSERTIONS**

Claimant's motion raises numerous issues calling for suppression of evidence that have support neither in law or fact.   Doc. 31, p. 3, ¶ 2; Id. at p. 4, ¶ 1 (all citations are not included for brevity).

**APPLICABLE LAW**

*Florida v. Harris* establishes the admissibility test for dog sniffs. *Florida v. Harris* 133 S.Ct. 1050, 1057 (2013).   Justice Kagan authored a detailed analysis of the facts, dog sniff limitations, and the legal implications. As a whole, the Court struck down the Floridian test as unnecessarily restrictive reminding, once again, that the question remains, "similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id*.

In *Harris*, the drug dogs and their handler completed lengthy narcotics detection classes offered by the Alabama Police Department. *Id*. at 1054. "Aldo" was privately certified, underwent a refresher course, and completed weekly training with his handler. *Id*.

Justice Kagan particularly noted, "Wheetley defended Aldo's two alerts to Harris's seemingly narcotics-free truck: According to Wheetley, Harris probably transferred the odor of methamphetamine to the door handle, and Aldo responded to that 'residual odor.'" *Id.* The trial court found probable cause, denied the motion to suppress, and the intermediate state court summarily affirmed. *Id* at 1054-1055.

The Supreme Court chided Florida when the Florida Supreme Court found "the fact that the dog has been trained and certified is simply not enough to establish probable cause." *Id* at 1055. The Supreme Court continued, "[m]aking matters worse, the decision below treats records of a dog's field performance as the gold standard in evidence, when in most cases they have relatively limited import. Errors may abound in such records. If a dog on patrol fails to alert to a car containing drugs, the mistake usually will go undetected because the officer will not initiate a search. Field data thus may not capture a dog's false negatives. Conversely (and more relevant here), if the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person. Field data thus may markedly overstate a dog's real false positives. By contrast, those inaccuracies—in either direction—do not taint records of a dog's performance in standard training and certification settings. There, the designers of an assessment know where drugs are hidden and where they are not—and so where a dog should alert and where he should not. The better measure of

a dog's reliability thus comes away from the field, in controlled testing environments." *Id*. at 1056-1057.

The Supreme Court emphasized the importance of certification or training programs. "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs. After all, law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources." *Id*. at 1057.

*Harris* did not eliminate defendants, or claimants, opportunities to challenge a drug dog's reliability. *Id.*  Claimants may cross-examine the testifying officer or introduce fact or expert testimony. *Id*.  *Harris* established the procedure, "The court should allow the parties to make their best case. . . [a]nd the court should then evaluate the proffered evidence to decide what all the circumstances demonstrate. If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence. In all events, the court should not prescribe, as the Florida Supreme Court did, an inflexible set of evidentiary requirements. The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make

a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test." *Id*. at 1057.

The Seventh Circuit recently applied the *Harris* opinion. *United States v. Bentley*, 795 F.3d 630 (7th Cir. 2015)*.* In *Bentley*, the Defendant argued drug dog "Lex" was prone to false positives in the field. *Id.* at 635. The Seventh Circuit applied *Harris,* and noted the Supreme Court recently rejected a proposed rule that would have treated the dog's field record as a "gold standard." *Id*. "To the contrary, it said, the record is of 'relatively limited import.' *Florida v. Harris,* ––– U.S. ––––, 133 S.Ct. 1050, 1056, 185 L.Ed.2d 61 (2013); see also *United States v. Funds in Amount of $100,120.00,* 730 F.3d 711, 724 (7th Cir.2013) (recognizing that *Harris* changes the district judge's analysis)." *Bentley,* 795 F.3d at 635. "Instead, 'evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert.' *Harris,* 133 S.Ct. at 1057. In order to assess whether the police adequately trained their dog, the *Harris* Court instructed trial judges to hold a probable-cause hearing." *Bentley,* 795 F.3d at 635.

At the hearing, both parties produced competing expert witnesses. *Bentley,* 795 F.3d at 635. "The Court did not, however, suggest what weight courts should give to different types of evidence, nor did it offer any tie-breakers for district courts to use. The district judge dutifully followed the *Harris* Court's instructions: he let the government submit evidence about Lex's training. That evidence included the dog's success rates in controlled settings as well as testimony from the dog's handler and the training institute's founder. The judge also allowed Bentley to challenge those findings, to cross-examine the handler and the Canine Training Institute's (CTI) founder, and to put on his own expert witness. The judge then weighed all the evidence, decided to credit the government's experts over Bentley's, and decided that Lex's alert was reliable enough to support probable cause. Our review of a district court's choice between one version of the evidence and

another is typically very deferential (even if experts are involved), and we are given no reason to deviate from that approach here." *Id.* at 636.

The Seventh Circuit long has held "the government is not obligated to reinvent the wheel by proving ... that the practice of using dogs to ferret out currency recently in contact with drugs is generally accepted" although the proper procedure for mounting such a challenge to the reliability of drug-dog alerts to currency is by means of a *Daubert* hearing. *United States v. $30,670,* 403 F.3d 448 (7th Cir.2005); *United States v. 100,120*, 730 F.3d 711 (7th Cir. 2013).

Naturally, asset forfeiture cases also rely upon drug dogs. Claimant cites both *United States v. 100,120*, 2015 WL 5212055 (NDIL 2015), hereinafter, *Funds III*, and *United States v. 100,120*, 730 F.3d 711 (7th Cir. 2013), hereinafter, *Funds II*. *Funds* is an ongoing 2003 asset forfeiture case pending in the Northern District of Illinois, 03CV3644. *Funds II* is binding Circuit precedent. *Funds III* is not binding Circuit precedent as the final pretrial conference is scheduled for December 18, 2015. *United States v. 100,120*, 03CV3644, NDIL, Doc. 271.

*Funds II* focuses upon the district court's summary judgment finding in favor of the United States and failure to rule upon the United States' *Daubert* challenges to claimant Marrocco's expert evidence. *100,120*, 730 F.3d at 715. Before the Seventh Circuit, Marrocco did "not challenge the district court's ruling that the government *could* satisfy its burden under Section 983(c)(3) by proving that Fallon matched a drug courier profile, the Funds could not be attributed to a legitimate source, and Deny's alert demonstrated that the Funds recently had been in contact with illegal drugs. *See $30,670,* 403 F.3d at 454–70; see also United States v. $174,206.00 in U.S. Currency,* 320 F.3d 658, 662 (6th Cir.2003). Rather, Marrocco argues that genuine disputes of material fact exist with respect to whether he had legitimately acquired the Funds and whether Deny's alert demonstrated that the Funds recently had been in contact with illegal drugs." *Id.* (emphasis in the original). In reversing

the *Daubert* issue[1], the Seventh Circuit found, "[n]othing in *$30,670* precludes Marrocco from offering expert evidence attacking Dr. Furton's research and challenging the conclusion that drug-dog alerts to currency are probative of whether 'the most recent holder of the currency was involved with illegal narcotics activity.'" *100,120*, 730 F.3d at 720.  Then, importantly, the Seventh Circuit found that Marrocco "offered the affidavit testimony of Sanford A. Angelos, a forensic chemist" who disputed Dr. Furton's findings. *Id.* Ultimately, the Seventh Circuit found, "[t]hrough this expert evidence, Marrocco has created a dispute of material fact" and a *Daubert* hearing was necessary.  *Id* at 721. *Funds III* follows *Funds II* and exists, presumably, because of attorney reader-error. *100,120*, 2015 WL 5212055, *3 (NDIL 2015).

## ARGUMENT

Claimant's position differs fundamentally from Marrocco and Bentley's position.  Claimant has neither designated an expert, nor supported any factual assertion with scientific evidence.  In sum, Claimant retains the right to cross-examine Chief Singleton regarding whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. *Harris*, 133 S.Ct. at 1057.

## INADMISSIBLE EVIDENCE

Claimant, however, attempts to admit expert opinion without foundation, without expert support or disclosure and contrary to Fed.R. of Evid. 702 and 703.   Claimant opines "the widespread contamination of currency with cocaine makes establishing what substances a drug dog has been trained to react to a key consideration to evaluating reliability of an alert to currency in the asset

---

[1] The Seventh Circuit disposed of whether or not Marrocco legally acquired the Funds by noting the Government only had official tax documents between 1999 and 2003 and Marrocco's affidavit stated he saved the funds prior to 1999.   Thus a material fact existed for trial.   *Id.* at 718-719.

forfeiture context." Doc. 31, p. 8. In short, Claimant bypassed the Seventh Circuit's finding; "Marrocco "offered the affidavit testimony of Sanford A. Angelos[2], a forensic chemist" and, thereby, "created a dispute of material fact." *Id* at 720-721. Instead, Claimant leapt to Marrocco's hoped for conclusion: widespread contamination exists and dog alerts are unreliable. *Funds III* is still pending trial. *United States v. 100,120*, 03CV3644, NDIL, Doc. 271.

This Plaintiff still maintains the full pannalopy of rights guaranteed by Federal Rule of Civil Procedure 26(a) (2) (disclosure of expert witnesses). If Claimant Kirkham wanted to admit Claimant Marrocco's expert's opinion, Claimant Kirkham needed to disclose the opinion and witness pursuant to Fed.R.Civ.P 26(a) (2) prior to the close of discovery, October 4, 2015. Doc. 17.

The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c) (1). The only exception exists when Claimant proves non-disclosure was justified or harmless. *Finley v. Marathon Oil Co.,* 75 F.3d 1225, 1230 (7th Cir.1996); *Doe v. Johnson,* 52 F.3d 1448, 1464 (7th Cir.1995); *Dura Automotive Sys. of Indiana, Inc. v. CTS Corp.,* 285 F.3d 609, 616 (7th Cir.2002). Here, the error is neither justified, nor harmless. Through the *Daubert* motion and hearing, Claimant attempts to eliminate key evidence and, potentially, win his case. Claimant proposes achieving this goal without producing an expert. As such, Claimant's actions are similar to those in *Dura.* Dura Automotive disclosed only one of several known experts. *Dura,* 285 F.3d at 616. When their expert was deemed incompetent to testify, Dura was prohibited from offering the other known, but purposefully withheld alternative experts. *Id.* In this case, discovery is closed and Plaintiff has no opportunity to review an expert report, depose the expert, or obtain an additional expert witness. Thus, Plaintiff is harmed. *See Finley,* 75 F.3d at 1230-1231. (Holding "While . . . data used . . . [was] not new, the manner of massaging them. . . . was new, and . . . . disclosed only a few days before the

---

[2] One of the issues in *Funds III* is the fact that Claimant's expert passed away. To avoid confusion, Plaintiff continues to refer to all *Funds* experts as "Angelos."

start of the trial would have placed on Marathon a heavy burden. . . . with its own experts' analysis.).
Therefore, any and all unsupported expert opinions must be stricken from Claimant's *Daubert* motion[3].

Additionally, Claimant uses another of Marrocco's claims. Claimant argues "*Funds II* noted that expert testimony establishing the reliability of the dog's alert is of heightened importance in a forfeiture case where the currency at issue is no longer available for laboratory testing because, as here, it has been deposited in a bank account and comingled with other funds." Doc. 31.

In September 2014, Singleton and McElroy worked for the United States Drug Enforcement Agency as Deputized Task Force Officers. As such, their conduct was governed by federal law. Seized U.S. currency taken by any of the 221 Domestic DEA offices or any of the 86 Foreign Offices[4] (and, to the extent practicable, seized foreign currency and negotiable instruments) must be deposited promptly in the Seized Asset Deposit Fund pending forfeiture. *See* 28 CFR §8.5. The only exception

---

[3] Claimant's motion contains multiple inadmissible opinions from an undisclosed expert witness. These include: "the chemical substance to which Paco was alerting, to provide conclusions about how and what dogs smell . . ." Doc. 31, p. 3. "In light of the widespread contamination of currency with cocaine, the relevance of either of these conclusions relies on assumptions based in expertise in an area in which TFO Singleton is not qualified as an expert: the specific identification to which chemical substances, if any, his canine has been trained to alert and the elimination of substances to which Paco has not been trained to alert." *Id*. 3-4. This gap indicates that TFO Singleton cannot exclude the possibility that Paco, a multipurpose dog, may have been trained—intentionally or inadvertently—to alert to either untainted currency or currency tainted by cocaine residue at prevailing levels in ordinary circulation. *Id* at 3-4. "This case law is clear that the court will not *presume* that a dog's alert is reliable where a proper *Daubert* challenge is made." *Funds III*, 2015 WL 5212055, at *5" *Id* at p. 4-5. (again failing to note that Marrocco presented expert testimony that Kirkham has not); the entire subsection "C" and "D" labeled "the widespread contamination of currency with cocaine makes establishing what substances a drug dog has been trained to react to a key consideration to evaluating reliability of an alert to currency in the asset forfeiture context" and "TFO Singleton is Not Qualified to Testify as an Expert About What Paco's Behavior Indicates, and Any Opinion Or Conclusion He Offers About Paco's Abilities or Behaviors to Discern Particular Chemical Substances Is Based on Unreliable Methodology Type" *Id*. p. 8-11.

[4] http://www.dea.gov/about/Domesticoffices.shtml

to depositing seized funds is if the currency has "a significant independent, tangible evidentiary purpose" such as a "traceable amount of narcotic residue." 28 CFR §8.5(c). Depositing the funds was not an individual decision, but a world-wide Regulation effective for all 307 DEA offices. Claimant's argument is speculative, at best, and provides no reason for a *Daubert* hearing.[5]

## OTHER CLAIMS

*Harris, Bentley*, *Funds II*, and *Funds III* all agree that Claimant may challenge the results of Paco's alert. As long as Claimant is not using inadmissible expert opinions provided in another trial, Claimant may question Singleton regarding Paco's training, the three and a half years Paco was assigned to an unknown officer and whether or not that affected his 2014 abilities, and argue to this Court that Singleton's testimony will not assist the trier of fact.

## PACO'S TRAINING

Claimant asserts that Paco was trained improperly. Paco's training records and methods of training have been provided to Claimant and Claimant has deposed Singleton regarding Paco's training. Si Tr. p. 1-15; Doc. 28-4, p. 1-11; 28-5, p. 1-3. Despite Claimant's reservations, Paco has been recognized nationally. Si. Tr. p. 15; Doc. 28-5, p. 4. Additionally, Singleton testified that as Illinois law changed for narcotics certifications, Paco's certifications have changed in accord with the law. *Id*. at 15, 18-19; Doc. 28-5, p. 4, 7-8. Paco is "certified with USPCA one year which stands for United States Police Canine Association, and on top of that he's also met all of the minimum standards that the state requires with the Illinois Training Standards Board." *Id*. at 15; Doc. 28-5.

---

[5] Consider the alternative. Claimant stated he placed $210,000 in the tire. Law enforcement found $220,020. 28 CFR §8.5 guarantees the funds are counted and delivered to a financial institution pending the outcome of the case rather than sitting in an evidence locker. The regulation contemplates a different procedure if narcotics residue is visible on the funds. 28 CFR §8.5(c). Plaintiff has no information suggesting Claimant told TFO staff that there was cocaine residue on the funds and that he wanted the funds independently tested. Plaintiff has disclosed to Claimant the photograph that depicts the packaging. 28 CFR §8.5(c).

Claimant deposed Singleton and both counsel questioned him regarding Paco's training. Singleton testified that Paco is certified to identify "cannabis, or marijuana, crack cocaine, powder cocaine, methamphetamine and heroin." *Id*. at 7, ln. 23-25; Doc. 28-4. Singleton testified that Paco is trained to alert "on the odor of each of those, but as far as the specific chemical or something like that, if that's what you're asking, I do not know." *Id*. at 9, ln 8-13., *Id*. at 25, ln 8-12; Doc. 28-4; Doc. 28-6. Singleton also explained that Paco is not trained to alert differently to each of the different chemical odors. *Id.* at 8, ln, 10-17; Doc. 28-4.

Singleton detailed Paco's training.

> "Since I had already been through two other academies with Brian, Brian trusted that I knew how to handle the dog and be a handler and he knew Paco from I guess some work he had done with Paco before giving the dog to me, so that's why it was reduced to three weeks instead of six weeks. But the dog had already been through a six-week academy, I had already been through two six-week academies and then a three-week academy with Paco. Since that time, Paco and I have not only certified regionally, we've certified nationally."

Si Tr. p. 15; Doc. 28-5.

Specifically related to narcotics, Singleton testified how Paco was trained to detect and alert to cannabis, or marijuana, crack cocaine, powder cocaine, and methamphetamine and heroin odors to the exclusion of all other odors.

> "There's different types of -- we call them search boxes where different odors will be hidden in one box, and if -- obviously there's a separate box for each odor so the odors aren't contaminated and mixed. So if the trainer hides marijuana, say, in a scratch box, then he won't hide cocaine in that same scratch box. It will be different. Now, there's other boxes up, like on a wall per se, filled with tennis balls or filled with food or a lot of times we'll use -- if we have a male dog, we'll use a female dog's odor if she's in heat, just anything that would distract the dog, just to train them to always go to the source of the odor. So that way when they alert, they're trained to go to the exact source of the odor, and that also teaches the handlers who are watching them what their exact behavior is when they do a final alert. As I told the other attorney, ma'am, his final response is always he'll nose poke and scratch. Now, before he does that final response, a lot of times I'll see a head turn, his breathing will change, but that trains us to see this in a smaller environment or in a closed environment to where we can learn our dog's behavior. And we do several repetitions of this to where **we know their behavior when**

> **they're smelling the odor, when they go into odor, where they start smelling one of the five narcotics that they're certified in.** (emphasis added).

*Id*. at p. 17- p. 18, ln 17-18; Doc. 28-5.

Singleton explained how Paco's skills were maintained.

> "[W]e train 16 hours a month typically, I'm aware of two different times where he's had false positives. . . .Paco. . . is a multipurpose dog. He's not a narcotic only dog, so there are other areas that need training as well.   But [for narcotics] we usually train on vehicles and we'll do different hides on vehicles. . .   We usually train twice a month for eight hours. . . we train what we can in eight hours, because obviously in between each exercise the dogs need rest. . . If we do a bunch of bite work in one session, then the following session we'll do a lot of narcotic work. . ."

Si Tr, p. 9-11; Doc. 28-5.

> "We do both [indoors and outdoors training]. . . We mix it up in training. . . We do do outdoor training when it's very cold as well, but the majority of our training outdoors is weather permitting. . . Being a handler since 2008, I've never had a dog not hit on something due to it being too cold or too hot. I think it's fair to say that's more of an opinion."

Si Tr, p. 13; Doc. 28-6.

> "Any time that we do training, we pick somebody, and we try to always do blind hides. We don't like to know where it's hidden. The only time we like to know where it's hidden, if there's maybe a problem that we're trying to work out that our canine has had, but I (p. 20 ln 21-end) would say **99.9** percent of the time we do blind hides because that tells us if the dog is finding it, then he's finding it. If he's not, then there's something that we need to critique or work on, thus the reason for training. . . I'll add this. The only time that I don't do blind hides is if I can't make the training where we train together as a group, I do training on my own. If I don't have somebody else available to hide the -- whatever it is, whatever kind of narcotic it is for me, then I'll hide it myself, whether it's in school lockers or in a junk yard on some old cars. But other than when I'm training on my own, if I'm training as a group, we always try to do the blind hides, yes." (emphasis added).

Si Tr., p 20- 21; Doc. 28-6.

Under the balancing test reaffirmed by *Harris*, substantial evidence exists to credit Paco's training. Paco was trained to alert to odors of cannabis, or marijuana, crack cocaine, powder cocaine, and methamphetamine and heroin to the exclusion of all other odors.   No contradictory evidence has been submitted.   Rather, the evidence overwhelmingly supports Paco's reliability.   Singleton used

11

multiple techniques to distract Paco, to no avail. *Id*. at p. 17- p. 18, ln 17-18; Doc. 28-5. "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Harris,* 133 S.Ct. at 1057. Therefore, Claimant's assertion that *Daubert* should exclude Singleton's testimony should be denied.

## THREE AND A HALF YEARS

Since December 2011, Singleton has worked with K9 Paco, a multipurpose police dog. *Id*. at 8; Doc. 28-4. At deposition, Singleton testified about his experience with police dogs and, specifically, with K9 Paco. *Id.* Singleton received Paco after Paco was certified in apprehension, patrol, and narcotic work. *Id.* at 8; Doc. 28-4. "He's certified in cannabis, or marijuana, crack cocaine, powder cocaine, methamphetamine and heroin." *Id*. at 7; Doc. 28-4. "However, obviously, being with a new handler, I also had to go through that with him over again, so I went through about approximately a three-week course." *Id.* at 14-15; Doc. 28-5. Thus, in 2011, Paco was already trained and was re-trained upon transfer to Singleton.

Furthermore, three additional years passed between Paco's transfer to Singleton. During that time, Paco was retrained, certified, nationally recognized, and regularly refreshed his skills as outlined in preceding paragraphs. Plaintiff respectfully incorporates prior arguments and facts concerning Paco's extensive and successful training.

Singleton described Paco's training. "There's different types of . . .search boxes where different odors will be hidden in one box. . . So if the trainer hides marijuana, say, in a scratch box, then he won't hide cocaine in that same scratch box. . . Now, there's other boxes up, like on a wall per se, filled with tennis balls or filled with food or a lot of times we'll use -- if we have a male dog, we'll use a female dog's odor if she's in heat, just anything that would distract the dog, just to train them to always go to the source of the odor. So that way when they alert, they're trained to go to the exact

source of the odor, and that also teaches the handlers who are watching them what their exact behavior is when they do a final alert." *Id.* at 17-18; Doc. 28-5.

Singleton has been trained to observe Paco's alert signals. "As I told the other attorney, ma'am, his final response is always he'll nose poke and scratch. Now, before he does that final response, a lot of times I'll see a head turn, his breathing will change, but that trains us to see this in a smaller environment or in a closed environment to where we can learn our dog's behavior." *Id*. at 18; Doc. 28-5. Throughout their years together, Singleton is aware of Paco only falsely alerting twice. *Id* at p. 9-10; Doc. 28-4.

Paco's three and a half year gap, here, is overcome by a three week retraining course, bi-monthly refresher training, annual certifications, and Paco's national recognition. Claimant has not produced evidence of aberrant K9 behavior. Thus, Claimant's assertion lacks merit and under *Harris* and *Bentley* no reason exists to deny admissibility of the dog's alert.

## ASSISTANCE TO THE TRIER OF FACT

Plaintiff respectfully argues Singleton's testimony will assist the trier of fact. Fed.R.Civ.P. 26(a)(2)(C)(i) and (ii) only require that witnesses who do not provide written reports must only provide the subject matter on which the witness is expected to testify and a summary of facts and opinions. Plaintiff respectfully disagrees that the only information provided regarding Singleton was the paragraph contained in Document 31, exhibit 4. *See* Doc. 28-4, 5, and 6. In sum, Singleton has testified that Paco is trained "to always go to the source of the [illegal drug] odor. So that way when they alert, they're trained to go to the exact source of the odor, and that also teaches the handlers who are watching them what their exact behavior is when they do a final alert." *Id.* at 17-18; Doc. 28-5. Singleton is able to assist the trier of fact by illuminating the nuances of dog behaviors and alerts and how Paco, specifically, was trained and how Paco alerts. *See also United States v. Green*,

740 F.3d 275, 283-284   (4th Cir. 2014) (Finding that Canine "Bono's field performance records in conjunction with his degree  of training, his performance during training and recertification exercises, and his evaluations by Troopers Dillon and Settle, the totality of the circumstances establish Bono's reliability in detecting drugs.");   *United States v. Gadson*, 763 F.3d 1189, 1203 (9th Cir. 2014) (Finding based upon "the standard enunciated in *Harris*, the evidence regarding the reliability of Marley's alert was more than adequate. Investigator Moore gave extensive testimony regarding his and Marley's training and certification. He also testified regarding Marley's reliability rating of 100 percent in the field. The defendants did not proffer evidence to the contrary. Accordingly, the district court did not abuse its discretion in admitting evidence of Marley's alert.").

## CONCLUSION

For the reasons set forth herein, the United States respectfully moves this Court to deny Claimant's *Daubert* motion.

    Respectfully submitted,
UNITED STATES OF AMERICA

STEPHEN R. WIGGINTON
United States Attorney

*s/ Jennifer Hudson*

JENNIFER HUDSON
Assistant United States Attorney
United States Attorneys Office
Nine Executive Drive
Fairview Heights, IL   62208
Phone:   (618) 628-3700
Fax: (618) 622-3810
E-mail: jennifer.hudson2@usdoj.gov