UNITED STATES DISTRICT COURT
SOUTHERN DIVISION OF ILLINOIS
EAST ST. LOUIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| v. ) | Cause No. 3:15-cv-90 NJR PMF |
| ) | |
| $220,020.00 IN UNITED STATES ) | |
| CURRENCY, ) | |
| ) | |
| Defendant. ) | |

**CLAIMANT JAMES KIRKHAM'S RESPONSE IN OPPOSITION TO
THE UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Claimant James Kirkham ("Claimant"), by and through undersigned counsel, and submits this Response in Opposition to the United States of America ("Government")'s Motion for Summary Judgment. In support of this Response, Claimant states as follows:

**I.     STATEMENT OF DISPUTED FACTS**

Claimant responds to the Government's 11-page discussion of the "factual basis" for its Motion for Summary Judgment by stating his objections to (1) the Government's failure to identify facts which it claims are undisputed, as required by Fed. R. Civ. P. Rule 56(c)(1), and (2) to the Government's presentation of clearly disputed assertions, and even opinions and conclusions, as undisputed facts. Herein, Claimant puts forth his best effort, through counsel, to succinctly respond to each of the Government's assertions that are disputed and to present evidence supporting such disputes.

1.     Then-DEA Deputized Task Force Officer Stacy McElroy ("McElroy") did, on September 9, 2014, stop the black 2009 Chevy Silverado in which Claimant was a passenger and

1

which his mother, Darlene Kirkham ("Mrs. Kirkham") was driving on Interstate 70 at approximately the 29 mile marker. Gov. Mot. Sum. J., ECF No. 28, Nov. 12, 2015 (hereafter "Gov. MSJ"), at 1. Although McElroy claims he observed the truck "following too closely," video evidence and other testimony establish that the Silverado was not following too closely at all, or at least that there is dispute as to whether the alleged violation was actually committed. Exhibit 1, Video File M2U00322, at 0:00-1:01 (hereafter "Ex. 1")[1]; Darlene Kirkham Tr. 16:24-17:8, ECF No. 32-6, Nov. 23, 2015 (hereafter D. Kirkham Tr.); *see also* Cl.'s Mot. to Suppress Physical Evid., ECF No. 29, Nov. 12, 2015 (hereafter Mot. to Suppress).

2. Upon approaching the Silverado and during the stop, McElroy allegedly made observations that he subjectively believed to be suspicious, Gov. MSJ at 1-3, including:

   a. A "strong masking agent" coming from the vehicle, several air fresheners in the cab of the vehicle, and several pieces of luggage in the back seat of the cab. *Id.* at 1-2.

   b. That Claimant "stared straight ahead" when McElroy approached the vehicle, and when McElroy informed Claimant that his wallet was falling out of his pocket, Claimant allegedly placed the wallet between his legs and continued staring straight ahead. *Id.* at 2.

   c. That Mrs. Kirkham stated they were traveling to California, specifically Sacramento, to visit Donna, her sister-in-law, and Donna's husband Bob who was dying; and that Mr. Kirkham also stated they were visiting Bob and Donna but mistakenly believed Bob and Donna lived in Los Angeles, California. *Id.* at 2, 3.

   d. That Mrs. Kirkham could not identify precisely what was wrong with Bob, although both she and Mr. Kirkham confirmed that Bob was dying. *Id.* at 2, 3.

---

[1] Exhibit 1 is a video file that will be manually filed with the Clerk of the Court on the date of filing this Response.

2

    e. That Mrs. Kirkham and Claimant were traveling without their diabetic husband/father, Mr. Kirkham Sr., who was having diabetes-related foot problems. *Id.* at 2.

    f. That Mrs. Kirkham did not know Bob and Donna's address but would need to call their daughter, Lisa, to meet her and would then follow Lisa to Bob and Donna's house, and that Mrs. Kirkham accidentally misspoke, calling Lisa their sister before correcting herself. *Id.* at 2-3.

    g. That while Mrs. Kirkham was being questioned in the police vehicle, she was "overly talkative," had "poor eye contact" and looked down at her hands or out the windshield, was "wringing her hands," and twisted her wedding ring on her finger and "fumbled" with it. *Id.* at 3.

    h. That at one time Mrs. Kirkham almost misspoke, saying "San Fr." before correcting herself to say Sacramento. *Id.* at 3.

However, these observations are much ado about nothing. Claimant disputes that there was a "strong masking agent" coming from the vehicle, that he "stared straight ahead" when approached by McElroy, and that his mother was "overly talkative" or had poor eye contact with McElroy. In fact, the evidence refutes any such assertions. *See* Ex. 1 at 5:25-16:25; D. Kirkham Tr. 16:36-17:11, 20:12-22:11, 23:21-24:4; *see also* Mot. to Suppress at 2-6. Moreover, although some of McElroy's stated observations seem to be accurate, Claimant disputes McElroy's and the Government's characterization of such facts as suspicious or otherwise noteworthy. *See* Ex. 1 at 5:25-16:25; D. Kirkham Tr. 16:36-17:11, 20:12-22:11, 23:21-24:4; *see also* Mot. to Suppress at 2-6. At best, whether McElroy correctly made and/or interpreted such observations is a fact issue that requires evaluation of the reliability of witnesses and the weight of evidence, and

cannot be resolved on summary judgment.

3. Claimant disputes the Government's characterization of, and any significance that TFO McElroy or the Government attaches to, TFO McElroy's allegations regarding Ms. Kirkham's behavior upon his request to search the vehicle, including but not limited to statements that "McElroy noted that Ms. Kirkham did not verbally answer the question" and "Ms. Kirkham looked down at her hands, shook her head no, and rotated her wedding ring." Gov. MSJ at 3-4. Again, whether McElroy correctly made and/or interpreted such observations is a fact issue that requires evaluation of the reliability of witnesses and the weight of evidence, and cannot be resolved on summary judgment. This evidence has been recorded on video recording and differing inferences can be argued from the video evidence. *See* Ex. 1.

4. Claimant disputes the Government's assertion that a can of drywall screws, some car air fresheners, and the plywood box in the truck bed, found during the search, are "interesting" for any reason. Gov. MSJ at 4. Such everyday, common items carry no significance, and the weight or reliability of such evidence is a factual issue that cannot be resolved on summary judgment.

5. Claimant disputes the Government's assertions regarding the plywood box found in the truck bed, including assertions about the potential use for which the box was intended. Gov. MSJ at 4-5. In fact, the evidence shows that the plywood box was used by Claimant's father, the owner of the truck, for transporting and protecting DVDs, which he regularly hauled and sold at flea market-type events. Kevin Thebeau Unsworn Decl. ¶ 14, ECF Nos. 2-1 & 2-2, Jan. 28, 2015 (hereafter "Thebeau Decl."); James Kirkham Tr. 13:17-18, ECF No. 32-1, Nov. 23, 2015 (hereafter "Cl. Tr."); D. Kirkham Tr. 31:8-32:5.

6. Claimant disputes the Government's assertion that "it was safer to take the

Silverado to Collinsville Automotive than take the mechanic to the highway," Gov. MSJ at 5, because this is a conclusory statement unsupported by any fact in the record.

7. Claimant disputes that K-9 Paco "alerted" to the truck. Gov. MSJ at 5, 7-8. Ms. Kirkham, who was present at the scene, did not see Paco "alert" on the truck although she saw him walk around the truck. D. Kirkham Tr. 24:9-14, 22-25. Claimant further disputes the validity and significance of any alleged "alert," because the weight to be given a dog "alert" is to be determined by the trier of fact and is not appropriately resolved on a summary judgment motion.

8. Claimant disputes all facts supported by reference to TFO Singleton's testimony. Paco's and TFO Singleton's credentials, training, and expertise are the subject of Claimant's Motion to Exclude the Testimony of TFO Christopher Singleton under *Daubert*, ECF No. 31, Nov. 23, 2015, still pending before this Court. If the Court rules in favor of Claimant's Motion, TFO Singleton's testimony will be excluded and should not be considered on a summary judgment motion. In fact, because TFO Singleton has not yet been certified as an expert by this Court, and should not be, his expert opinions are not admissible at trial and cannot be relied upon to support a summary judgment motion.

9. Claimant disputes the Government's assertion that the Kirkhams' destination was not clear. Gov. MSJ at 8. Claimant and Ms. Kirkham both told TFO McElroy they were going to California. In fact, they were going to Sacramento to visit Claimant's aunt and uncle because his uncle was dying of cancer (and has since passed away). D. Kirkham Tr. 12:19-13:1, Thebeau Decl. ¶ 3. Although Claimant mistakenly believed his aunt and uncle lived in Los Angeles, rather than Sacramento, there was no reason to expect him to be familiar with their ultimate destination since he wasn't driving and had not been to visit his aunt and uncle since he was young. Thebeau Decl. ¶¶ 6, 8; Cl. Tr. 31:8-19, 32:10-33:8.

10. Claimant disputes the Government's assertion that Claimant and his mother were on the "wrong highway" to go to Sacramento. Gov. MSJ at 8. There are a number of ways to get to Sacramento from Indianapolis, and Claimant's deposition answers were made under counsel's objection that there are multiple ways to get to Sacramento and that the Government's statement that the Kirkhams were going the "wrong way" was not in evidence. Cl. Tr. 101:7-102:24. The Government's assertion is actually a misstatement (the Kirkhams were headed basically due west, traveling on a similar looking (on a map), but slightly longer route that passed through major cities rather than small towns). In fact, Claimant stated that he does not know how to get around the country using the highway system and could not explain whether or why his mother did not take the most direct route to Sacramento. *Id.* at 34:1-16, 104:11-17. Claimant does not even have a drivers license, and has not had one for some time. Thebeau Decl. ¶ 6. Regardless, the evidence shows that Claimant and his mother were going to Sacramento, California to visit their dying relative. Thebeau Decl. ¶¶ 3, 6, 8; Cl. Tr. 31:8-19, 32:10-33:8; D. Kirkham Tr. 12:19-13:1.

11. Claimant disputes the Government's assertion that Claimant "failed to provide any records [of his transactions at Combs Gold and Stuff] as requested in discovery." Gov. MSJ at 9. Claimant made an extensive effort to find and provide all existing records of every transaction he made between 2010 and 2014, but as is established by extensive testimony in this case, such records do not exist. *See*, *e.g.*, Cl. Tr. 47:4-8, 49:10-11, 52:9-54:1, 79:22-80:5, 82:8-21, 93:9-21. In Claimant's business buying and selling gold, jewelry and collectibles, it is ordinary to transact business almost exclusively in cash and to not keep sales or purchase records. *See*, *e.g.*, Soel Tr. 8:5-18, ECF No. 32-3, Nov. 23, 2015; Peel Tr. 7:7-10, 7:25-8:3, ECF No. 32-4, Nov. 23, 2015. The fact that Claimant was able to substantiate over $150,000 in sales

during the time period in question is remarkable in itself, and the record shows that these sales are only a portion of his total sales between 2010-2014. *See, e.g.*, Cl. Tr. 47:4-8, 49:10-11, 52:9-54:1, 79:22-80:5, 82:8-21, 93:9-21. Moreover, the Government readily admits that the over $150,000 in income already substantiated by Claimant is legitimate and does not constitute illegal funds. Gov. MSJ at 9-10.

12. Claimant objects, pursuant to Fed. R. Civ. P. 56(c)(2), that Brian McCall's opinion testimony is inadmissible at trial and may not be used to support the Government's Motion for Summary Judgment. Specifically, Claimant objects to McCall's opinion that "he worked on very, very thin margins," and that he was "thrilled" to make a profit on items he sold. Gov. MSJ at 11 (citing McCall Tr. 21-22, ECF Nos. 28-21 & 28-22, Nov. 12, 2015). Moreover, McCall's testimony as to his purchase negotiations with Claimant are completely hypothetical and are not based on any particular transaction. McCall has no personal knowledge of Claimant's business margins or the profitability of his business, and he is not capable of rendering an admissible opinion on those topics. Moreover, Claimant disputes the Government's assertion that Claimant worked on very small margins. Gov. MSJ at 10-11. Claimant testified that he at least doubles his money on everything he sells. Cl. Tr. 54:1-3, 54:25-55:1, 55:21-25. Claimant's substantiated income of over $150,000, constituting only a portion of his sales in a primarily cash business, proves that Claimant's business was healthy and profitable. *See* Gov. MSJ at 9-10; Cl. Tr. 92:1-93:21.

13. Claimant disputes the Government's attempt to discount his substantiated earnings by insinuating that Claimant's expenses have not been deducted from his substantiated income. Gov. MSJ at 10-11. As an initial matter, the Government has not produced any evidence to prove the amount of any of Claimant's alleged expenses that it claims should be deducted

from his substantiated income. *See id.* As the Government itself notes, Claimant's live-in girlfriend, Brittney Brown, worked and contributed to household expenses until 2014. *Id.* at 11 (citing Brown Tr. 14-15, 18, 20-21, ECF No. 28-23, Nov. 12, 2015). Moreover, Claimant has already testified that the majority of his cash sales remain unaccounted for because no records of those transactions exist, and that testimony remains uncontradicted. *See*, *e.g.*, Cl. Tr. 47:4-8, 49:10-11, 52:9-54:1, 79:22-80:5, 82:8-21, 92:1-93:21.

14. Claimant objects, pursuant to Fed. R. Civ. P. 56(c)(2), that the Government's allegations regarding Claimant's previous buying trips to Phoenix cannot be supported by evidence that is admissible at trial in this matter because all such facts are irrelevant to the case at hand. The Government has not proven that Claimant's trips to Phoenix have any relation to the source or intended use of the defendant funds at issue in this case, or that Claimant was involved in any activity during his previous trips to Phoenix that would cause the defendant funds in this case to be forfeitable. *See* Gov. MSJ at 11 (discussing Claimant's trips to Phoenix but never making any connection between those trips and the funds at issue in this case). In fact, Claimant's uncontradicted testimony establishes that he traveled to Phoenix to make legitimate purchases for his business, including to purchase limited-issue "Jordans" which are unavailable in the Indianapolis area but are a highly sought-after collectible. Cl. Tr. 38:6-24. Claimant's trips to Phoenix, even if relevant and admissible at trial, do not support the Government's contentions and are the subject of legitimate factual dispute.

## II.   LEGAL STANDARDS

### A. Standard for Summary Judgment

"The burden of persuasion imposed on a moving party by Rule 56 is a stringent one." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). "Summary judgment should not be

granted unless it is clear that a trial is unnecessary . . . and any doubt as to the existence of a genuine issue for trial should be resolved against the moving party." *Id.* (internal citations omitted); *see also Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004) (on a summary judgment motion, the court "construes all facts and draws all reasonable inferences from the record in favor of the non-moving party.") "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 248-49, *quoting First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968).

### B. Government's Burden of Proof in Civil Forfeiture Cases

"[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252. The Government has alleged that "[t]he defendant property constitutes property furnished or intended to be furnished by a person in exchange for a controlled substance, or proceeds traceable to such an exchange, or property used to facilitate a violation of 21 U.S.C. § 801 *et seq.* and is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6)." Compl. ¶ 7, ECF No. 2, Jan. 28, 2015. The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") states that in any civil forfeiture proceeding, "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture;" and "if the Government's theory of forfeiture is that the property was used to commit

or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C § 983(c)(1), (3). This "substantial connection" must be "more than incidental or fortuitous." *United States v. One Parcel of Real Estate*, 903 F.3d 490, 494-94 (7th Cir. 1990) (analyzing use of the "substantial connection" test in forfeiture proceedings, which was adopted in many circuits prior to CAFRA). In determining whether the Government has carried its burden, courts look to the totality of the circumstances. *United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars,* 403 F.3d 448, 455 (7th Cir.2005).

### III.     STATEMENT OF LAW AND ARGUMENT

The Government has not proven, and in fact cannot prove by a preponderance of evidence, that the defendant property was "furnished or intended to be furnished by a person in exchange for a controlled substance, or [constitutes] proceeds traceable to such an exchange, or property used to facilitate a violation of 21 U.S.C. § 801 *et seq.*" Compl. ¶ 7.  There is, moreover, substantial factual dispute concerning material facts relied upon by the Government in support of that proposition.  Thus, the property is not subject to forfeiture, and the Government's Motion for Summary Judgment should be denied in its entirety.

Contrary to the Government's assertion, courts in the Seventh Circuit do not "regularly" grant summary judgment for the Government in forfeiture cases. Instead, courts grant summary judgment for the Government only when it is warranted; that is, when the Government has proven its case by a preponderance of the evidence and there are no genuine issues of material fact to be resolved at trial. *See* FRCP Rule 56(c); *United States v. Funds in the Amount of One Hundred Thousand One Hundred & Twenty Dollars ($100,120.00)*, 730 F.3d 711, 716 (7th Cir.

2013. Often, the cases in which summary judgment is granted to the Government include cases where the claimant was convicted of drug trafficking or possession in connection with the seizure of property, or where the funds were discovered in close proximity to drugs together with additional evidence supporting forfeiture. Neither of these factual situations is present in this case.

In fact, the Seventh Circuit has made clear that on summary judgment, a court may not disregard witness testimony, even if it is self-serving or unsubstantiated, because to do so is "to weigh the strength of the evidence or make credibility determinations--tasks belonging to the trier of fact." *$100,120.00*, 730 F.3d at 718. Thus, Claimant's deposition testimony that he made much more money during the period in question than he has been able thus far to substantiate through sales records is itself sufficient to create a genuine issue of fact as to the legitimate source of the funds in question. In this case, moreover, Claimant's testimony *is* substantiated by testimony from other witnesses that his business' sales were predominantly cash sales, and by the fact that he has already been able to produce evidence of over $150,000 in legitimate income—three-quarters of the amount in question.

Where the claimant is able to establish that some or all of the funds in question were derived from legitimate means, summary judgment for the government is improper, and in fact courts often award summary judgment to the claimant in such cases. In *$644,860*, the currency at issue was discovered during a search of the individual claimant's vehicle during a routine traffic stop—it was found in a black bag in the trunk of the car after a drug dog alerted on the car. *$644,860*, 2008 U.S. Dist. LEXIS 57487, at *1-2, 2008 WL 2952348. The government's case relied solely on the "suspect circumstances" under which the currency was discovered; the positive alert by the drug detection dog; that the claimant was traveling from the Midwest, a

"drug destination area," to California, a "drug source state," with a large amount of concealed and bundled cash; and the alleged "inconsistencies" between the claimant's story to police and his arguments before the court. *Id.* at *3-4, 10. The Central District of Illinois found the government's "litany of suspicious circumstances" was not enough to satisfy the government's burden of proof in the face of claimants' evidence that the funds in question came from investors and creditors of the corporate claimant. *Id.* at *2-3, 9-11; *$100,120*, 730 F.3d at 718-19 (finding a genuine issue of material fact, and reversing and remanding the trial court's grant of summary judgment to the government, where the claimant testified that the funds in question were his life savings obtained through legitimate means, and the trial court improperly disregarded that testimony).

Here, as in *$644,860*, the Government strains to create a circumstantial case against the defendant funds in the absence of any evidence of a substantial nexus between the funds and illegal drug activity. For one, it insinuates that the amount of money seized and the manner it was being transported is itself suspicious, citing *United States v. $30,670,* 403 F.3d 448, 466 (7th Cir. 2005). However, even though other Circuits may find large amounts of currency indicative of illegal activity, the Seventh Circuit has held:

> the government may not seize money, even half a million dollars, based on its bare assumption that most people do not have huge sums of money lying about, and if they do, they must be involved in narcotics trafficking or some other sinister activity. Moreover, the government may not require explanations for the existence of large quantities of money absent its ability to establish a valid narcotics-nexus.

*United States v. $ 506,231 in United States Currency*, 125 F.3d 442, 454 (7th Cir. 1997); *see also United States v. $304,980 in United States Currency*, No. 12-cv-0044-MJR-SCW, 2013 WL 785113, 2013 U.S. Dist. LEXIS 28231, *15-16 (S.D. Ill. Mar. 1, 2013) ("[T]he mere fact there is a large amount of cash proves nothing[.]").

Then the Government asks the court to accept the unsupported proposition that Claimant displayed "common traits of drug couriers," despite the fact that no drugs were found in the vehicle where the currency was discovered, and further investigation revealed no connection between the defendant funds and any drug activity whatsoever. The Government cites a number of cases, though only one from the Seventh Circuit, in support of its contention that courts recognize certain traits as indicating drug courier activity. *See* Gov. MSJ at 14. The Seventh Circuit case cited, *United States v. $30,670,* 403 F.3d 448, 467 (7th Cir. 2005), is factually distinguishable from this case. There, the evidence considered by the court to be "drug courier" activity was that the claimant always traveled by one-way tickets purchased usually the day of travel, which the court found suspicious in light of the expense of such tickets and the claimant's unemployment and lack of income for the previous months; and his "haphazard" travel schedule in which never stayed the same amount of nights and often changed his return dates, which prompted the court to comment that drug couriers "must be very flexible in their travel plans." *Id.* at 467-68. In fact, the claimant in that case had stayed in Phoenix 27 nights during the two months previous to the seizure of his assets. *Id.*

In an attempt to cast Claimant as a drug courier, the Government discusses Claimant's trips to Phoenix, but Claimant has extensively explained that those were buying trips for his business, where he is able to procure collectibles not available in the Midwest. Claimant's previous business trips have nothing to do with the trip to California that Claimant and his mother were making at the time they were stopped by TFO McElroy. Unlike the factual situation in *$30,670*, Claimant's trips to Phoenix are well documented; they were not "haphazard" but instead were planned in advance; Claimant did not frequently use one-way tickets; and his tickets were purchased through a friend who was travel-savvy and arranged cheaper flights for him, as

13


opposed to the claimant in *$30,670* who used expensive tickets notwithstanding his lack of employment or income. Moreover, even if a claimant fits the "profile" of a drug courier, not even reasonable suspicion for a search can be derived from that conclusion alone. *United States v. Marrocco*, 578 F.3d 627, 633 (7th Cir. 2009) (reasonable suspicion to justify a search "cannot be based solely on an officer's conclusion that a suspect fits a drug-courier profile"). Thus, such evidence is probative of very little where the Government must prove a connection between the seized property and illegal drug transactions by a preponderance of the evidence.

      Most importantly, in forfeiture cases where courts consider the claimant's travel habits as evidence in favor of forfeiture, the claimant is engaged in the suspect pattern of travel *at the time the assets subject to forfeiture are seized*. *See $30,670,* 403 F.3d at 467 (claimant's travel habits on trips to Phoenix were relevant because he was stopped in an airport attempting to make another trip to Phoenix when he was discovered to be wearing a women's girdle stuffed with over $30,000 in cash); *United States v. $124,700 in U.S. Currency,* 458 F.3d 822, 826 (8th Cir. 2006) (the claimant's travel habits for the trip he was currently on when he was stopped and the currency was seized were relevant to the question of whether the currency was connected to illegal activity; though the trial court found for the claimant, a divided panel of the Eighth Circuit reversed).[2] In this case, uncontroverted evidence clearly establishes the Kirkhams were traveling to California to visit a sick relative. The Government has failed to connect Claimant's past business trips to Phoenix (which he took alone and by plane, rather than by a road trip with his mother) to the defendant funds in any way. Evidence concerning those trips is thus irrelevant to the Government's burden to establish a substantial connection between the defendant funds and

---

[2] The Government's additional citation to *United States v. Thomas,* 913 F.2d 1111, 1115-17 (4th Cir. 1990) on this point is unavailing. *Thomas* arose out of a DEA investigation into the claimant's activities as a suspected drug dealer, rather than during a traffic stop or other search unconnected to an ongoing police investigation, and his travel habits were monitored as a part of that ongoing investigation.

illegal drug activity.

The Government makes a further weak attempt to construe Claimant's and his mother's statements about their travel plans as inconsistent, seizing on innocent mistakes caused primarily by the Kirkhams' unfamiliarity with California geography, as neither of them had been to California in about 20 years. The record clearly shows, however, that Claimant and his mother gave entirely consistent explanations of their travel, telling TFO McElroy repeatedly as well as testifying at depositions that they were on their way to California to visit Claimant's dying uncle, who has since passed away. Moreover, Claimant's mistaken belief that his aunt and uncle lived in Los Angeles rather than Sacramento, and his mother's failure to plan the trip with maximum efficiency, still provide no evidence that the defendant funds have any connection to illegal activity whatsoever. *See United States v. $48,100.00 in United States Currency*, 756 F.3d 650 (8th Cir. 2014) (where much of the circumstantial evidence regarding the claimant's trip and inconsistent statements to police could weigh in favor of either party, and claimant could have lied to police for any reason, including one unrelated to any illegal drug activity; the government failed to carry its burden of proof that seized funds were connected to illegal drug transactions).

Finally, the Government asserts that the dog Paco's alert on the truck and the currency is persuasive evidence of the currency's connection to illegal drugs. As an initial matter, that "alert" is factually disputed by other evidence, including by testimony of Darlene Kirkham disputing the alert, and for that reason alone, summary judgment is improper here.

In a recent case involving another of Paco's positive alerts on currency seized during a traffic stop in which TFO Singleton was involved, this Court found that the evidence of the dog's positive alert was not sufficient to satisfy the Government's burden of proof and denied summary judgment. *United States v. $304,980 in United States Currency*, No. 12-cv-0044-MJR-SCW,

15

2013 WL 785113, 2013 U.S. Dist. LEXIS 28231, *17 (S.D. Ill. Mar. 1, 2013). The court cited "problems" with one of the two dog alerts presented as evidentiary proof of narcotics activity, as well as law enforcement's "failure to corroborate" the dog alerts by conducting laboratory testing on the currency to verify the presence of narcotics residue, in finding that the Government had failed to prove that it was entitled to summary judgment. *Id.* at 17. Moreover, as stated previously, the validity of Paco's alerts in this case and TFO Singleton's qualifications as an expert are challenged in Claimant's Motion to Exclude the Testimony of TFO Christopher Singleton under *Daubert*, ECF No. 31, Nov. 23, 2015, still pending before this Court. If this Court rules in favor of Claimant, this evidence and TFO Singleton's testimony will be inadmissible at trial and cannot be relied upon in a summary judgment motion. Until this Court rules on Claimant's motion and certifies TFO Singleton as qualified to testify as an expert, the allegations regarding Paco's alerts in this case, like in *$304,980*, are insufficient to support the Government's Motion for Summary Judgment. *See $304,980*, 2013 U.S. Dist. LEXIS 28231 at *17. In any event, such evidence has limited value, is factually disputed, and even together with the other evidence in this case, it does not satisfy the Government's burden of proof on summary judgment.

## IV. CONCLUSION

WHEREFORE, Claimant James Kirkham requests this honorable Court issue its Order denying the Government's Motion for Summary Judgment in its entirety.

Dated: December 17, 2015				Respectfully submitted,

					By:	/s/ Adam D. Fein
						Attorney for Claimant, James Kirkham
						Adam D. Fein
						120 South Central Avenue, Suite 130
						Clayton, Missouri 63105
						(314) 862-4332/ (314) 862-8050
						afein@rsrglaw.com

**CERTIFICATE OF SERVICE**

By signature above, I further certify that on December 17, 2015, the foregoing was served by operation of the Court's electronic filing system on Ms. Jennifer D.L. Hudson, Assistant United States Attorney.